**Gustave ZURAK et al.,
Plaintiffs-Appellees,**

v.

**Paul J. REGAN et al.,
Defendants-Appellants.**

**No. 425, Docket 76–2100.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 29, 1976.

Decided Feb. 7, 1977.

---

6. The problem of apportionment has not arisen in Trust No. 3 because all payments in that trust are from principal.

Gordon J. Johnson, The Legal Aid Society, New York City (Natalie J. Kaplan, William E. Hellerstein and Donald H. Zuckerman, Attys., The Legal Aid Society, New York City, on the brief), for plaintiffs-appellees.

Arlene R. Silverman, Asst. Atty. Gen., State of New York, New York City (Louis J. Lefkowitz, Atty. Gen. of State of N. Y., and Samuel A. Hirshowitz, First Asst. Atty. Gen., State of New York, New York City, on the brief), for defendants-appellants.

Before LUMBARD and VAN GRAAFEILAND, Circuit Judges, and BONSAL, District Judge.*

LUMBARD, Circuit Judge:

Defendants-appellants, members of the New York State Board of Parole (hereinafter "the Board") and state correctional services officials, appeal from an injunction issued in the Southern District, dated July 30, 1976, upon findings by Judge Carter that due process requires that defendants: (1) institute procedures to ensure that applications for conditional release from the New York City Correctional Institution for Men, Rikers Island, are processed in order of eligibility and within 60–90 days of the applicant's arrival at Rikers Island; (2) provide each inmate whose application for conditional release is denied or deferred a written statement of the reasons for the Board's action together with the facts relied upon in reaching the decision; and (3) accord to each applicant the opportunity for a personal appearance before the Board commissioner or commissioners responsible for determining the disposition of the application. Appellants contend that the inmates' interest in conditional release is not sufficient to make their claims cognizable under the Due Process Clause; further, they argue that in any event due process does not require the procedures ordered by the district court. We reverse so much of the district court's injunction which mandates an opportunity for personal appearance before a member of the Board and affirm the remainder.

Under New York Penal Law § 70.40(2)[1] individuals, such as were the appellees, serving one or more definite sentences of imprisonment with an aggregate term in excess of 90 days may request conditional release from custody at any time after the service of 60 days; release is at the discretion of the Board and is probationary for one year. "Definite sentences" under New York law never exceed one year, New York Penal Law §§ 70.00(4), 70.15(1), although a

---

\* Of the Southern District of New York, sitting by designation.

1. Section 70.40(2) provides as follows:

2. Definite sentence. A person who is serving one or more than one definite sentence of imprisonment with a term or aggregate term in excess of ninety days may, if he so requests, be conditionally released from the institution in which he is confined at any time after service of sixty days of that term, exclusive of credits allowed under subdivisions four and six of section 70.30. In computing service of sixty days, the credit allowed for jail time under subdivision three of section 70.30 shall be calculated as time served. Conditional release from such institution shall be in the discretion of the parole board, and shall be upon such conditions as may be imposed by that board, in accordance with the provisions of the correction law.

Conditional release shall interrupt service of the sentence or sentences and the remaining portion of the term or aggregate term shall be held in abeyance. Every person so released shall be under the supervision of the parole board for a period of one year. Compliance with the conditions of release during the period of supervision shall satisfy the portion of the term or aggregate term that has been held in abeyance.

person sentenced to two or more definite sentences may be required to serve an aggregate term of up to two years.[2] New York Penal Law § 70.30(2)(b). Definite sentences may be imposed for certain misdemeanors and certain low-grade felonies. See New York Penal Law §§ 70.15, 70.00(4). In contrast, sentences of more than one year are indeterminate and may be imposed only for crimes classified as felonies. New York law requires that the term of an indeterminate sentence be at least three years and provides that it may be for as long as life for certain crimes. See New York Penal Law § 70.00. An individual sentenced to an indeterminate term is eligible for parole after having served a minimum period of imprisonment (as fixed by the sentencing court, or, in certain cases, the Board), which must be at least one year and may be as long as 25 years. New York Penal Law § 70.00(3). Definite sentences are served in a county or regional correctional institution; indeterminate sentences must be served in a state prison. New York Penal Law § 70.20. Under New York Correctional Law § 214 applicants for parole, but not for conditional release, are entitled to a personal appearance before a three-member panel of the Board and a written statement of reasons and facts re-

lied upon if parole is denied. Appellees argued before the district court that the lack of such procedures in the case of conditional release applications violates both due process and equal protection and sought declaratory and injunctive relief pursuant to 42 U.S.C. § 1983.

Plaintiffs were all inmates serving definite sentences of more than 90 days at Rikers Island.[3] In its unreported decision of July 30, 1976, the district court granted plaintiffs' motion to proceed as a class pursuant to F.R.C.P. 23(b)(2), which was unopposed; the class consists of all inmates on Rikers Island who are or will become eligible for conditional release.[4]

The operation of the conditional release program was described at trial. Raymond Dorsey, the official supervising the Rikers Island conditional release program, testified that he and his staff attempt to explain the program to all eligible inmates within the first week of their arrival. Parole officers then interview those who wish to apply. There are no written guidelines on how these interviews are to be conducted. There are no established practices determining the order in which arriving applicants are to be interviewed;[5] rather, the district court found that the interviews are

2. The term of a definite sentence is credited with any time spent in custody prior to the commencement of the sentence as a result of the charge that culminated in the sentence. The credit is referred to as "jail time." New York Penal Law § 70.30(3). In addition, the term of a definite sentence may be significantly shortened through the use of good time credits. See New York Penal Law § 70.30(4).

3. The named plaintiffs have all been released from custody. See discussion in text, infra.

4. The district court record shows that on October 26, 1976 the district court granted plaintiffs-appellees' post-trial motion to amend the definition of the class to include inmates serviced by the Rikers Island parole staff who are transferred from Rikers Island to participate in certain programs in other parts of New York City. This amendment, which increases the size of the class by approximately 100 to 200 inmates, apparently went unopposed; accordingly, this court's opinion should be taken to refer to the class as amended.

5. The district court found the operation of the program to be "chaotic." For example, witness Maitland Jones testified that he was sentenced to a one year term on April 18, 1975 and arrived at Rikers Island on April 23. Jones stated that although he had applied for conditional release shortly after his arrival, he had not yet received an interview as of the date of his testimony, December 22, 1975. Appellees Zurak, Zambuto and Mack testified that a period of three to four months passed before they learned their applications had been denied. Appellee Santiago testified that although he arrived at Rikers Island on June 30, 1975, after repeated efforts to contact a parole officer he was unable to obtain an interview until November 16; as of December 22, 1975 Santiago, who was serving a one year term, had yet to hear from the Board. Appellee Halpern testified that he arrived at Rikers Island on April 30, 1975 and immediately applied for conditional release. Halpern stated that he was not interviewed until the end of August. Halpern's release was deferred until November and granted December 1, 1975; however, Halpern stated that he refused conditional release because he

conducted on a random basis without regard to the amount of jail time served.[6] During the interview the parole officer asks the inmate certain questions and takes down any information the inmate wishes to provide; the inmate is also advised that letters in his behalf or job offers may be sent to the parole officer to be included in the inmate's file.

Based on the interview and the inmate's file the parole officer prepares a written report, which is placed in the inmate's file. The report includes a personal and social history of the inmate based upon the interview and information contained in available presentence reports. The parole officer makes no independent investigation and although he sometimes makes a recommendation, the conditional release decision is ordinarily left entirely to the discretion of a Board commissioner. The district court found that under existing conditions, it customarily takes 60 to 90 days for parole officers to submit their reports to the Board.

The commissioner's decision is based entirely on the information contained in the inmate's file, including the parole officer's report and the presentence report; the commissioner neither interviews the inmate nor consults with the parole officer who conducted the interview. Inmates are not allowed to see their files. There are no written criteria upon which the commission-

ers base their decisions, although the testimony at trial indicated that they are primarily influenced by the applicant's prior record, the nature of his offense, the applicant's institutional adjustment and his future plans.[7] In September, 1975 the Board began to provide written statements of reasons and facts to inmates whose applications had been denied; prior to that time the Board's practice was merely to deny or defer an application without any statement. An inmate whose application has been denied may apply to the chairman of the Board for reconsideration.[8]

■ Before proceeding to the merits, we treat an initial issue regarding this court's jurisdiction. At oral argument appellants pointed out that by some time after the evidentiary hearing but prior to the district court's certification of the class in its order of July 30, 1976, all of the named plaintiffs had been released; accordingly, appellants now contend that the controversy is moot. We reject this contention. Although a litigant must ordinarily be a member of the class that he seeks to represent at the time the class is certified, see *Sosna v. Iowa*, 419 U.S. 393, 402–03, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), this case is a "suitable exception" to that requirement. *Gerstein v. Pugh*, 420 U.S. 103, 110–11 n. 11, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), *Sosna v. Iowa*, supra, 419 U.S. at 402 n. 11, 95 S.Ct. 553. Because of the relatively short periods of

had only 75 days left in his term and he preferred to serve this time rather than face a year-long probation.

**6.** New York Penal Law § 70.40(2) provides that jail time is to be treated as time served in computing the 60 day period. See notes 1 and 2, supra.

**7.** In *Haymes v. Regan*, 525 F.2d 540 (2d Cir. 1975), we held that, at least where meaningful statements of reasons and facts are provided, it is not necessary for the Board to promulgate and disclose formal rules regarding release criteria for parole. It appears that under New York law, application for parole and conditional release are evaluated under the same standards. See New York Correction Law §§ 213, 827; New York Penal Law § 70.40(2). See also *United States ex rel. Johnson v. Chairman, N. Y. State Board of Parole*, 500 F.2d 925, 930 n. 4 (2d Cir.), vacated and remanded as moot sub

nom. *Regan v. Johnson*, 419 U.S. 1015, 95 S.Ct. 488, 42 L.Ed.2d 289 (1974).

**8.** Lawrence Kavanaugh, Assistant Director of Field Operations of the Department of Corrections, indicated in his testimony that the Board's statements of reasons and facts (given since September, 1975) are prepared in accordance with New York Corrections Law § 214. He also stated that an inmate whose application has been denied may apply to the Chairman of the Parole Board for reconsideration and may indicate in a letter the reasons the original denial should be reconsidered. However, the record is silent on whether this opportunity for reconsideration is made generally known to the inmates.

incarceration involved and the possibility of conditional release there was a significant possibility that any single named plaintiff would be released prior to certification, although this possibility was less substantial than it was in *Gerstein.* As in *Gerstein,* however, the constant existence of a class of persons suffering the alleged deprivation is certain and the court may safely assume that counsel has other clients with a continuing live interest in the issues (appellees are represented by the Parole Revocation Defense Unit of the Legal Aid Society). See *Gerstein v. Pugh,* supra, 420 U.S. at 110–11 n. 11, 95 S.Ct. 854; *Frost v. Weinberger,* 515 F.2d 57, 62–65 (2d Cir. 1975); *McGill v. Parsons,* 532 F.2d 484, 488–89 (5th Cir. 1976); *Inmates of San Diego County Jail in Cell Block 3B v. Duffy,* 528 F.2d 954, 956–57 (9th Cir. 1975). Further despite the admonition of F.R.C.P. 23(c)(1) that the court shall make the class action determination "[a]s soon as practicable after the commencement of an action," for reasons which are not apparent, almost a year elapsed between appellees' uncontested motion for class action status and the district court's certification. Appellants make no contention on appeal that the certification was improper nor is there any question that the class was properly identified by the district court. See *Indianapolis School Comm'rs v. Jacobs,* 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975) (per curiam). It follows that this case is not moot because the controversy as to the named plaintiffs has been resolved. Because of the relatively short periods of incarceration involved and the possibility of conditional release, the alleged harm · can hardly be redressed while any possible plaintiff is still an inmate. See *Gerstein v. Pugh,* supra, 420 U.S. at 110 n. 11, 95 S.Ct. 854; *Sosna v. Iowa,* supra, 419 U.S. at 401–02, 95 S.Ct. 553. Furthermore, it is clear that there is a sufficient adversary relationship here to assure proper presentation of the issues. *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 752–57, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).

■ Turning to the merits, we must first inquire whether a prisoner's interest in conditional release is sufficient to warrant due process protection. Although the Supreme Court has rejected the notion that every state action having adverse consequences for an inmate automatically raises a question of due process, see, e. g., *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Moody v. Daggett,* 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976), it has left open the issue of whether, and to what extent, parole release procedures may be held to activate due process rights. See, e. g., *Moody v. Daggett,,* supra, 429 U.S. at 89, 97 S.Ct. at 279; *Scott v. Kentucky Parole Board,* 429 U.S. 60, 97 S.Ct. 342, 50 L.Ed.2d 218 (1976). As the district court noted, however, it is settled in this circuit that a prisoner's interest in prospective parole or "conditional entitlement" is entitled to due process protection: "Whether the immediate issue be release or revocation, the stakes are the same: conditional freedom versus incarceration." *United States ex rel. Johnson v. Chairman, New York State Board of Parole,* 500 F.2d 925, 928 (2d Cir.), vacated and remanded as moot sub nom. *Regan v. Johnson,* 419 U.S. 1015, 95 S.Ct. 488, 42 L.Ed.2d 289 (1974). See *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Holup v. Gates,* 544 F.2d 82 (2d Cir. 1976); *Haymes v. Regan,* 525 F.2d 540 (2d Cir. 1975).[9]

■ New York Penal Law § 70.40(2) provides inmates a "justifiable expectation rooted in state law," *Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976), that they will be conditionally released if they meet Board standards. See New York Correction Law § 827. Although the potential deprivation involved in an administrative decision is an appropriate factor to consider in determining the amount of process due, see *Mathews v. Eldridge,* 424 U.S. 319, 335, 341, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), it is the *nature* of the interest sought to be protected from

---

**9.** As noted by Justice Stevens in his dissent in *Scott v. Kentucky Parole Board,* supra, the circuits are in conflict on this issue. See 429 U.S. at 61, 97 S.Ct. at 343, and cases cited therein; *Mower v. Britton,* 504 F.2d 396, 397 (10th Cir. 1975) (dictum).

official action that determines whether due process attaches. See *Meachum v. Fano,* supra, 427 U.S. at 224, 96 S.Ct. at 2537. Whether labelled "conditional release" or "parole" the nature of the interest at stake in this case is the same: conditional freedom versus incarceration. See *United States ex rel. Johnson v. Chairman, New York State Board of Parole,* supra, 500 F.2d at 928; cf. *Wolff v. McDonnell,* supra, 418 U.S. at 556–57, 94 S.Ct. 2963.

Having determined that due process attaches, the question remains of how much process is due. In this inquiry we are guided by the Supreme Court's observation that identification of the specific dictates of due process generally requires consideration of three factors: 1) the private interest involved; 2) the risk of an erroneous deprivation of that interest through the procedures used, and the probable value of additional or substitute procedural safeguards; and 3) the public interest in maintaining existing procedures, including the function involved and the fiscal and administrative burdens entailed in additional or substitute procedures. See *Mathews v. Eldridge,* supra, 424 U.S. at 334–35, 96 S.Ct. 893.[10]

Turning first to the inmate's liberty interest we note that this court and others have distinguished between the inmate's interest in continued conditional freedom (involved in the parole revocation decision) and his anticipation or hope of freedom (involved in the parole release decision), see *Morrissey v. Brewer,* 408 U.S. 471, 482 n. 8, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Holup v. Gates,* supra, 544 F.2d at 85; *Childs v. United States Board of Parole,* 167 U.S.App.D.C. 268, 511 F.2d 1270, 1286 (1974) (Tamm, *J.,* concurring); in the latter instance the broad discretion afforded the Board necessarily lessens the required content of due process. See *Haymes v. Regan,* supra, 525 F.2d at 543.[11] We think a similar distinction can be drawn between the inmate's interest in conditional release and parole. As the state points out, applications for conditional release are less likely to be granted than are applications for parole; accordingly, the conditional release applicant's expectation of liberty is less justified and his interest is correspondingly less substantial. See *United States ex rel. Johnson v. Chairman, New York State Board of Parole,* supra, 500 F.2d at 928.[12] Further, because the conditional release applicant's sentence will almost always be shorter than that of the parole applicant, he will ordinarily have less at stake.[13] Thus, although the inmate seeking conditional release has a significant interest in the Board's decision, we think his interest less substantial than

---

**10.** In *Haymes v. Regan,* supra, 525 F.2d at 543, this court adopted an almost identical three-pronged balance between "the inmate's interest in the proceedings . . . the 'need for and usefulness of the particular safeguard in given circumstances' . . . (and) any direct burden which might be imposed on the Board" by this requirement, quoting *Frost v. Weinberger,* supra, 515 F.2d at 66, quoted in *Holup v. Gates,* supra, 544 F.2d at 85.

**11.** In *Childs v. United States Board of Parole,* supra, 511 F.2d at 1282, in a related context the court stated:
"There is a substantial difference on the due process issue between a finding of serious disciplinary action leading to loss of good-time credits, involved in *Wolff,* and denial of an application for parole. The broad discretion of the Board in the latter instance lessens the content of required due process . . . ."

**12.** In *Johnson* the court relied, in part, upon 1972 Board statistics showing that 75.4% (4,412) of the inmates applying for parole were successful; these statistics strengthened the court's conclusion that the inmates had a cognizable liberty interest in parole. Board statistics for 1974, however, reveal that only 29% (746) of the applicants seeking conditional release were successful.

**13.** See notes 1, 2 and 3, and accompanying text, supra. Appellees point out that the consequences of denial of conditional release to an inmate serving the maximum definite sentence (2 years, release possible after 60 days) and the consequences of denial of parole to an inmate serving the minimum indeterminate sentence (3 years, release possible after 1 year) almost overlap (22 months versus 24 months additional incarceration). However, since the court has only been given hypotheticals, and not facts, it can only presume what seems obvious: that the great majority of cases will not fall at the extremes presented in appellees' hypotheticals and thus in the majority of cases the consequences of an adverse decision of the Board will be far greater for the parole applicant than for the applicant for conditional release.

that involved in parole revocation and, perhaps, release. Accordingly, although we reject the state's contention that these considerations negate the existence of an interest sufficient to warrant due process protection, we adopt the position that the demands of due process should be less stringent. Compare *Mathews v. Eldridge,* supra, 424 U.S. at 341–43, 96 S.Ct. 893.

■■■ The district court found the administration of the conditional release program to be chaotic. Obviously, the program is almost meaningless to an inmate if he is unable to obtain even a preliminary interview after six months at Rikers Island,[14] and such administration amounts to an arbitrary denial of the statutory entitlement. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge,* supra, 424 U.S. at 333, 96 S.Ct. at 902, quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); see *Moody v. Daggett,* supra, 429 U.S. at 89–96, 97 S.Ct. at 279–283, (Stevens, *J.,* dissenting).[15] Since the testimony at trial indicates that applications are currently processed within 60–90 days of arrival at Rikers Island, the district court's order requiring

that applications for conditional release be processed in order of eligibility and within 60–90 days of an inmate's arrival imposes little, if any, additional administrative or fiscal burden. However, although we agree in principle with the district court's order, as a practical matter it may be impossible for the state authorities to process applications in strict order of eligibility and still maintain a fair and rational conditional release program.[16] Thus, for example, in processing applications the state authorities may wish to take into account the fact that an application has been filed in a tardy fashion. Because we view the court's order as an effort to deal with the exigencies at hand and not an attempt unnecessarily to tie the hands of the state authorities, we understand the court's mandate to require the processing of applications in strict order of eligibility only to the extent that this is practical and fair to the applicants. The state authorities thus remain free to fashion their own procedures to deal with administrative problems that may arise in the application of the program as long as applications are processed in a timely and rational fashion.

■■■ We have no difficulty with the district court's requirement of a statement

---

14. See note 5, supra.

15. The district court also correctly noted that the state legislature must have intended reasonably prompt action on conditional release applications.

16. In order to clarify some confusion evident at oral argument we note that by "eligibility" the district court obviously meant statutory eligibility. An inmate becomes "eligible" for release if he is serving one or more definite sentences with an aggregate term of at least 90 days and has served 60 days, including jail time as provided by statute. See notes 1 and 2, supra. It should be obvious that an inmate who may become eligible for conditional release and has served 20 days should ordinarily have his application processed before that of an inmate who has served only 10 days. Similarly, inmates who arrive with jail time should ordinarily be processed before inmates who arrive without such time; in any event, the staff has up to 90 days from the point at which an inmate arrives at Rikers Island within which to process his application (assuming the inmate falls within § 70.40(2) and desires to partici-

pate). While we appreciate Judge Van Graafeiland's concern with excessive involvement of the federal courts in state prison administration, any attempt to remedy unconstitutional action on the part of state prison officials must necessarily involve some "interference with the routine operation of a state penal system." We merely hold that the district court properly exercised its traditionally broad equitable discretion in shaping an order to eliminate the arbitrariness inherent in a system where applications are processed "at random." See *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944). Although problems may yet arise in the application of the conditional release program (such as how to treat tardy applications), the state authorities are in the best position to deal with such problems as they come up. This court simply cannot predict all the difficulties yet to be encountered and shape its order accordingly; to do so would unnecessarily strait jacket the state authorities.

of reasons and facts. The fundamental nature of such statements in parole release decisions is discussed by Judge Mansfield in *United States ex rel. Johnson v. Chairman, New York State Board of Parole,* supra, and was noted again in *Haymes v. Regan,* supra, 525 F.2d at 543–44, and *Holup v. Gates,* supra, 544 F.2d at 85–86. It is sufficient here to note that the same considerations apply to conditional release decisions and to emphasize that, particularly where an administrative body is vested with such large discretion, a requirement of a statement of reasons and facts is necessary to protect against arbitrary and capricious decisions or actions grounded upon impermissible or erroneous considerations. See *United States ex rel. Johnson v. Chairman, New York State Parole Board,* supra, 500 F.2d at 929. Such statements must provide the inmate with the grounds for a decision to deny or defer his application for conditional release, and the essential facts upon which the Board relied. See *Haymes v. Regan,* supra, 525 F.2d at 544. As the Board alleges that it has been voluntarily complying with this requirement since September, 1975, the court's order should constitute no additional burden.[17]

■ Given the foregoing procedural safeguards, and keeping in mind the interest at stake and the additional administrative and fiscal burdens involved, we conclude that a personal hearing before a member of the Board is not constitutionally mandated. Unlike a parole revocation proceeding, the procedures used in the conditional release program are not adversary in nature; rather, both the Board and the inmate have an interest in obtaining the inmate's release. See *Gagnon v. Scarpelli,* 411 U.S. 778, 784–85, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); *Hyser v. Reed,* 115 U.S.

App.D.C. 254, 318 F.2d 225, 237, 242 (1963) (en banc), cert. denied, sub nom. *Thompson v. United States Board of Parole,* 375 U.S. 957, 84 S.Ct. 446, 11 L.Ed.2d 315 (1963). Unlike parole revocation, the conditional release decision will rarely, if ever, involve complex factual disputes in which the inmate may have to prove himself innocent of criminal behavior or show factors in mitigation. See *Morrissey v. Brewer,* supra, 408 U.S. at 488, 92 S.Ct. 2593; *Gagnon v. Scarpelli,* supra, 411 U.S. at 786–88, 93 S.Ct. 1756; *Carson v. Taylor,* 540 F.2d 1156 (2d Cir.1976). Nor will conditional release decisions involve questions of serious violations of discipline in maximum security institutions as in *Wolff v. McDonnell,* supra, 418 U.S. at 558–63, 94 S.Ct. 2963. Under the district court's order, applications for conditional release must be processed within 90 days of an inmate's arrival at Rikers Island. The Board's decision is primarily influenced by the applicant's prior record, the nature of his offense, his institutional adjustment, and his future plans. Thus, given the short span of time between arrival at Rikers Island and the release decision and the fact that the parole officers make no independent investigations, the information upon which the Board acts must necessarily be obtained in large part from available presentence reports and the inmate interviews. Under New York Criminal Procedure Law § 390.50 defendants are given access to their presentence reports prior to sentencing and thus have an opportunity to learn of and correct any inaccuracies. Appellees do not claim that there is any motive for, or evidence of, fabrication in the parole officers' relation of the inmate interviews. Compare *Carson v. Taylor,* supra, 540 F.2d at 1161. Thus, the risk of the Board basing its decision on erroneous information is rel-

17. Of course, voluntary compliance does not make a controversy moot where, as here, there is a possibility of recurrence of the wrongful conduct. *Allee v. Medrano,* 416 U.S. 802, 810–11, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974); *United States v. W. T. Grant Co.,* 345 U.S. 629, 632–33, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). We also reject appellants' suggestion that this portion of the court's holding was unnecessary because New York Correction Law § 214(6)

provides for written statements of reasons and facts. Section 214 by its terms applies only to parole decisions. Moreover, we fail to see how appellants can rely on that part of section 214(6) which requires written statements and then ignore the language in the same section indicating that such statements are to be preceded by a hearing before a three-member panel of the Board—a procedure reserved for parole decisions.

atively minimal and the record simply does not support allegations that misinformed decisions have been prevalent in the past. Compare *Holup v. Gates,* supra, 544 F.2d at 86. The requirement of a statement of reasons and facts should serve to protect the inmate from arbitrary decisions, or those based on impermissible grounds, see *Haymes v. Regan,* supra, 525 F.2d at 544; *United States ex rel. Johnson v. Chairman, New York State Board of Parole,* supra, 500 F.2d at 929; further, if a decision has no basis in an inmate's file, judicial review should be available. *Holup v. Gates,* supra, 544 F.2d at 86.

Although a personal interview might provide the inmate with a better opportunity to present his case to the Board, we think that, under all the circumstances, the inmate has sufficient opportunity to present the relevant facts through the parole officer and by his own submission of any information helpful to his cause.

We cannot ignore the significant additional financial and administrative burdens necessarily involved in providing in-person hearings to all conditional release applicants. In 1974 there were some 2578 applications for conditional release by inmates at 62 local penitentiaries and jails throughout the state; 1200 of these applications were made by inmates at Rikers Island. The Board, which currently consists of 11 members, conducts about 15,000 hearings per year in panels of three. Even if the impact of a decision of this court requiring conditional release hearings could be limited to the class of inmates at Rikers Island, "[w]e only need say that experience with the constitutionalizing of government procedures suggests that the ultimate additional cost in terms of money and administrative burden would not be insubstantial." *Mathews v. Eldridge,* supra, 424 U.S. at 347, 96 S.Ct. at 909. Weighing all of these factors, we conclude that due process does not require that a personal appearance before a member of the Board be given to each conditional release applicant.

Finally, we find no merit in appellees' claim that the difference in procedures between inmates seeking conditional release and inmates seeking parole violates the Equal Protection Clause. See New York Correction Law § 214. Equal protection does not require that all procedural protections be applied in the same fashion without regard to the length of internment or the nature of the crime involved. See, e. g., *Marshall v. United States,* 414 U.S. 417, 422, 94 S.Ct. 700, 38 L.Ed.2d 618 (1974); *McGinnis v. Royster,* 410 U.S. 263, 269–70, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973); *Baldwin v. New York,* 399 U.S. 66, 90 S.Ct. 1886, 26 L.Ed.2d 437 (1970). Compare *Baxstrom v. Herold,* 383 U.S. 107, 110–11, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966).

Accordingly, we affirm the order of the court except as it requires appellants to provide a personal appearance before a member of the Board to applicants for conditional release.

VAN GRAAFEILAND, Circuit Judge, concurring in part and dissenting in part:

I concur in that portion of the majority opinion which holds that appellees are not entitled to appear personally before the Parole Board.

Since August 1975, the State has been furnishing rejected applicants for conditional release with written statements of the reasons for their rejection. For this reason, and because this Court has already spoken on this issue in the related field of parole, *see, e. g., United States ex rel. Johnson v. Chairman of New York State Board of Parole,* 500 F.2d 925 (2d Cir.), *vacated and remanded as moot sub nom. Regan v. Johnson,* 419 U.S. 1015, 95 S.Ct. 488, 42 L.Ed.2d 289 (1974), I also concur with the majority that such statements should be furnished.

As to the balance of the order appealed from, I would reverse. It requires the State to institute appropriate procedures to "insure" that conditional release applications be processed in order of eligibility and mandates that they be processed within 60–90 days of the arrival of an inmate on Rikers Island. In thus holding that the State may not process one prisoner's application until after it has processed the appli-

cation of another who will become eligible for release one day earlier, the District Judge has elevated the petty to constitutional status. Ignoring the admonition of the Supreme Court that "federal courts do not sit to supervise state prisons, the administration of which is of acute interest to the States", *Meachum v. Fano,* 427 U.S. 215, 229, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976), he has created another procedural morass for already beleaguered prison officials and created inequities in the process.

If constitutionality is to be equated with fairness, an unjustifiable equation under the law, *see Meachum v. Fano, supra,* 427 U.S. at 223–225, 96 S.Ct. at 2537, fairness to all should be the criterion. A plan is not fair which requires a prisoner, who makes prompt application for release, to sit patiently by until after the application of a less diligent inmate, albeit one with earlier eligibility, is passed upon by the Commission. A procedure is not just which mandates that an application, which is complete and untroublesome, gather dust on the shelf until information is compiled to complete the file of a more controversial applicant. Such Federal interference with the routine operation of a state penal system is not compelled by the Fourteenth Amendment which, we should occasionally remind ourselves, provides simply that no State shall "deprive any person of life, liberty, or property, without due process of law. . . ."

My colleagues, recognizing the inequities in the District Judge's order, construe it as if it did not contain the word "insure". They say that the procedures which the State is ordered to adopt must require the processing of applications in strict order of eligibility "only to the extent that this is practical and fair to the applicants." I submit that this constitutes not an affirmance but a reframing of the District Judge's order and, with all due respect to my colleagues, merely substitutes one unfortunate consequence of unnecessary federal interference for another. It is one thing to direct the State to promulgate rules which require processing in order of eligibility only to the extent that it is "practical and

fair"; it is quite another thing to promulgate them. If it is possible for the State to draft rules which will withstand the challenge of indefiniteness, what a Pandora's box they will open for the litigious prisoner who asserts their impractical or unfair application. This infelicitous result, we mandate in the name of Due Process.

My brothers say that, because applications are presently being processed within 60–90 days, the order which requires that this be done imposes little, if any, additional administrative or fiscal burden on the State. Of course, this is not the proper test to be applied in determining whether a Federal Court order should issue. The question, simply put, is whether the Constitution forbids the lapse of 91 days in the processing of applications. In his dissenting opinion in *Moody v. Daggett,* 429 U.S. at 89–96, 97 S.Ct. at 279–283, which my brothers cite with apparent approval, Justice Stevens, speaking with regard to parole revocation hearings, said at 97 S.Ct. 283 n. 12:

> I should also make clear that I would not prescribe any inflexible rule that the hearing must always take place within a fixed period.

There is no such inflexible rule in the Constitution.

Assuming that a prisoner has a constitutional right to have his application for conditional release processed with reasonable dispatch, this right cannot accrue until his application is made. The order, which requires that processing be completed within 60–90 days after the inmate's arrival on Rikers Island, completely ignores this fact. The order may well operate to benefit the tardy and troublesome inmate at the expense of his more diligent and deserving brother by requiring overworked parole officers to lay the latter's easily processed application aside while they meet the court-imposed deadline for the tardy troublemaker.

Our eagerness to correct asserted wrongs should not blind us to the fact that when we create a right, we also lay the groundwork for a remedy. One would expect that

a right of such constitutional magnitude as to justify delineation by this Court would merit drastic remedial relief. Contempt of court, habeas corpus and actions for damages are remedies which come readily to mind. Woe betide the hapless penal officer who violates an inmate's constitutional rights by processing his application out of order or by failing to process it within the prescribed ninety days. I have in the past expressed my concern about excessive involvement by the federal courts in the operation of state penal institutions. *See McRedmond v. Wilson*, 533 F.2d 757, 766 (2d Cir. 1976) (Van Graafeiland, *J.*, dissenting). Those portions of the order which I would reverse illustrate well the basis for my concern.